Cheryl L. Hodgson, Esq., SBN 141275
Hodgson Law Group
9606 Santa Monica Boulevard, Third Floor
Beverly Hills, California  90210
Tel. (310) 623-3515
Fax (310) 919-3515
Attorney for Defendant
chodgson@hodgson-law.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADOBE SYSTEMS INCORPORATED,<br><br>              Plaintiffs,<br><br>vs.<br><br><br>EDUARD SARKISOV<br><br>              Defendant. | **Case No. C 08-0936 (PJH)**<br><br>NOTICE OF MOTION AND MOTION TO TRANSFER FOR CONVENIENCE (28 U.S.C. § 1404(a)<br><br>Date:   August 6, 2008<br><br>Time:  9:00 a.m..<br><br>Place:  Courtroom 3, 17th Floor |

TO PLAINTIFF AND ITS ATTORNEY OF RECORD:

Please take notice that on August 6, 2008 at 9:00 a..m. or as soon thereafter as the

matter may be heard in the courtroom of Honorable Phyllis J. Hamilton, Defendant will and

does herby move to transfer this action to the Central District of California for the

convenience of the parties and witnesses pursuant to  28 U.S.C. § 1404(a).

This motion is based upon this Notice of Motion, the Memorandum of Points and

1

Authorities and the Declaration of Eduard Sarkisov filed and served herewith, and upon the

papers, records and pleading on file herein.

Respectfully submitted,

Dated:  July 2, 2008

By: _____
    Cheryl L. Hodgson
    HODGSON LAW GROUP
    9606 Santa Monica Blvd., Third Floor
    Beverly Hills, CA 90210
    Attorney for Defendant

# MEMORANDUM OF POINTS AND AUTHORITIES

## FACTUAL BACKGROUND

On February 13, 2008, the Software & Information Industry Association, located in Washington, D.C. announced "it has filed the largest round of lawsuits since launching its auction site anti-piracy program. . .  SIIA filed . . . on behalf of members Adobe Systems Incorporated and Symantec Corporation."  Sark. Dec. ¶10; Ex. 3.

With great fan fare, the SIIA has publicly labeled Defendant, an undergraduate student at Cal State Northridge, CA as a "pirate" even singling him out in a second article in May 2008.  Sark. Dec. ¶11; Ex. 4.   The case against Defendant alleges trademark and copyright infringement based upon Defendant's purchase and resale of allegedly unauthorized copies of Adobe Photoshop.  Whether or not a student purchasing packaged goods and reselling them should be publicly reported as a "pirate" of Adobe software remains to be determined.

SIIA chose this court in an obvious case of forum shopping.   Defendant is a resident of Van Nuys, CA and will be the principal witness in his defense.  Defendant has insufficient means to defend this action in the Northern District of California, and respectfully requests transfer to the Central District of California.  He is the primary witness in his defense.   Since the filing of this action, Defendant has been diagnosed with abnormal heart rate of tricuspid valve regurgitation which has caused him discomfort, pain and sleep deficiency and is now under the care of a cardiologist as well as his general physician.  Sark. Decl. ¶16. Ex. 7.

Eduard Sarkisov is student at Cal State University, Northridge, majoring in Business Administration.  Sark. Decl. ¶4; Ex. 1.   Mr. Sarkisov was acting as a reseller of products for other companies which were legitimate, including Microsoft which wrote request submission of product by Defendant to confirming the authenticity.  Sarkisov received written

confirmation from Microsoft.   *Id.* ¶ 5, Ex. 2.   Defendant received no prior notice of

infringement from the SIIA or Adobe claiming he was engaged in unlawful activity.  Sark.

Dec. ¶ 7.   Upon being served with this action Defendant voluntarily provided full disclosure

and documentation to Plaintiff as to the company from whom he purchased copies of

Adobe.   *Id.* ¶ 8.   Despite Defendant's good faith, Adobe has failed to provide

documentation as to the "pirated" nature of the product purchased by Sarkisov, and

settlement discussions have been unsuccessful.  *Id.*¶ 9.

The SIIA has also retained counsel in the Central District, namely Mr. Andrew

Coombs in Glendale, CA to act on behalf of Plaintiff.   Ms. Hodgson, counsel for Defendant

is also located in the Central District.  While convenience of the lawyers is not an issue, it is

an obvious set of facts that can not be ignored.

**ARGUMENT**

**The Court Should Exercise its Discretion and Transfer the Case to the Central**

**District in which Defendant Resides**

A motion for transfer under 28 U.S. C. § 1404(a) for *convenience* of the parties and

witnesses may be brought even after a responsive pleading has been filed.  The right to

bring this motion is not affected by any possible waiver of improper venue.  *Upjohn Co. v.*

*General Accident Ins. Co.* 581 F. Supp. 432, 436 (D. D.C. 1984).   Moreover, the Court may

order transfer without and oral or written opinion "if the record as a whole demonstrates the

factors were considered."  *Westinghouse Electric Corp., v. Weigel*, 426 F. 2d 1356 (9th Cir.

1970).  The court has to power to order transfer under § 1404(a) *sua sponte.  Federal Civil*

*Procedure Before Trial* § 4:774 at 4-91 (2008), *citing inter alia, Mills v. Beech Aircraft Corp.*,

886 F.2d 758, 761 (5th 1989).

**A.  Venue Would Have Been Proper in Central District of California**

Defendant meets the first requirement of a transfer pursuant to 28 U.S.C. § 1404(a), namely that venue would have been proper in the Central District, to which transfer is requested in this Motion.  This is an action alleging trademark and copyright infringement under Titles 15 and 17 U.S.C.  As a result, venue would have been proper in the Central District pursuant to 28 U.S.C. § 1391(b)(1)  since this is "a judicial district where any Defendant resides," and there is only one Defendant.   The requirements of *Hoffman v. Blaski*, 363 U.S. 335, 343-344, 80 S. Ct 1084, 4 L.Ed.2d 1254 (1960) are also met.  *See A.J. Industries v. U.S. Dist. Ct.,* 503 F. 2d 384 (9th Cir. 1974).

**B.  A Review of the Elements Supports Transfer of this Action to the District of Defendant's Residency.**

Transfer of this action to the Central District meets the statutory requirements that "a transfer be for the convenience of the parties and in the interest of justice."  *A.J. Industries v. U.S. Dist. Ct.,* 503 F. 2d 384, 387 (9th Cir. 1974).   The two foregoing factors, together with convenience of the witnesses are the three factors generally identified, and "are to be addressed to the *inherent discretion* of the court."  *Federal Civil Procedure Before Trial* § 4:725, at 4-85 (2008), *citing E.& J. Gallo Winery v. F. & P.S.P.A.,* 899 F. Supp. 465, 466 (E.D. Cal. 1994).

1. Defendants' Financial Resources are Extremely Limited and should be considered.

A court may consider the relative means of the parties in deciding a transfer motion. *Dwyer v. General Motors Corp.***,** 853 F. Supp. 690 (S.D.N.Y. 1994).   This is especially true, where as here, there is in fact a *huge* disparity between the parties.    *Berman v. Informix Corp.,* 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998).

Mr. Sarkisov had income of $2540.00 in 2006 and $9858.00 in 2007.  Sark. Decl. ¶ 12 .   Adobe on the other hand, announced record revenues for 2007 of $3.158 billion," an

increase of 23% over the previous year.  Sark. Dec. ¶ 13; Ex. 5.  On June 17, 2008, Adobe reported net income of earnings of $ 214.9 million for the Second Quarter of 2008 an increase of 41%. Sark. Dec. ¶ 14; Ex. 6.

*Dwyer* involved parties in exactly the opposite party position, but the same relative means as in the present action.  In *Dwyer*, the court refused transfer sought by a large corporate Defendant, since the Plaintiff was an individual with limited means to pursue the case in the home turf of the corporate defendant.   *See also Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp.2d 1060, 1073 (Ha.  2000). "The Post is a large corporation that could more easily travel to Hawaii to litigate than could Plaintiff travel to New York."

2. <u>Plaintiff seeks injunctive relief which favors transfer to the Central District</u>

Adobe seeks permanent injunctive relief against Mr. Sarkisov for alleged violations of the Lanham and Copyright Acts.  The Plaintiff in *Law Bulletin Publishing Co. v LRP Publications, Inc.*, 992 F. Supp 1014, 1020-21 (N.D. Ill. 1998) sought transfer from Illinois to Florida.  The court ordered transfer, in part based upon Plaintiff's request for injunctive relief under the Lanham Act for unauthorized copying of Plaintiff's publications.   Plaintiff claimed Defendant's argument to be "peculiar."  Judge Alesia disagreed:  "The court finds LRP's argument to be persuasive, not peculiar.  [B]y the time relief is granted, LRP's headquarters will be in Florida. . . .  Florida is the better forum to enforce and monitor any injunctive relief awarded" since it was "closer to the action." *Id.*

Adobe may be seeking huge damages from Mr. Sarkisov.  However, even if monetary damages are awarded, it is doubtful Mr. Sarkisov will be in a position to satisfy any such judgment.  Injunctive relief and publicity value appear to be the focus of this action.  While adverse publicity is not a matter for the court, monitoring of injunctive relief is indeed for the court.  Such activity would be best done in the Central District where Mr. Sarkisov

resides.

3.   Convenience of Witness and Parties

An important consideration for the court is the convenience of the parties and witnesses.  This determination, however, is not solely focused on the number of witnesses in each location, but rather on "the materiality and importance of the anticipated witnesses' testimony" and then on their convenience to the forum. Gates *Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335-36 (9th Cir. 1984).

Mr. Sarkisov is not only a party, but the primary defense witness on his behalf.  Two key issues exist in this action.

(i) Can Adobe prove the copies purchased by Mr. Sarkisov were counterfeit and "pirated," **not** by Mr. Sarkisov, but by the seller located in China?  If not, Plaintiff may not succeed on the merits; and

(ii)  What was Mr. Sarkisov's knowledge and good faith belief as to the legal nature of the Adobe product purchased by him?   Determination of the second will govern the extent to which Adobe can prevail in its claims for enhanced monetary relief.

So far, despite requests, Adobe has provided no evidence to support its claims the goods were counterfeit.  Sark. Dec. ¶ 9.  Mr. Sarkisov's testimony will show that the prices he paid, together with similar pricing for "authentic" copies of Adobe software on the Internet lead him to believe the product he purchased was legitimate.  Sark. Dec. ¶ 6. Mr. Sarkisov has cooperated from the outset.  He voluntarily disclosed the identity of the company from whom he purchased product.  *Id.* ¶  8.

For treble damages for "counterfeiting" as requested in plaintiff's prayer, 15 U.S.C. § 1117(b) requires a two part showing of intent:   "Plaintiff must prove that the defendant acted "intentionally" in dealing in the goods and knew the goods were counterfeit."  Senate-

5

House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong.

Rec. H12076 at 12083 (October 10, 1984). *McCarthy on Trademarks* § 30:94, n.2.

Statutory damages under (c ), also prayed for in the complaint, are determined upon a

showing of "willfulness" 15 U.S.C. § 1117(c)(1)(2).  The second is an issue which will turn on

defendant's testimony.

   4. <u>Sarkisov is under the Care of a Cardiologist since the Filing of this Action</u>.

   Since the filing of this action, Sarkisov has suffered stress related heart problems

such as abnormal rate of tricuspid valve regurgitation which has caused discomfort, pain,

and sleep deficiency. He is presently under the under the care of a cardiologist. *Id.* ¶ 16.

There is little risk of injury or serious illness to Adobe.  Defendant on the other hand, has

suffered greatly since the filing of this action.  The added stress of travel to San Francisco

for trial, without access to medical care if needed, also ways in favor of granting Defendant's

motion.

**CONCLUSION**

   Defendant acknowledges that Adobe is to be afforded proper deference and

consideration as to its choice of forum.  However, plaintiff can hardly complain that the

Central District is *inconvenient* for it, when it chose to file the case using counsel from the

Central District to which transfer is sought.   Both sets of trial counsel and the defendant are

in the Central District.

   There is an undisputable huge disparity in resources between the parties.

Defendant has already done and provided to Adobe what he can, so far without resulting

ability to settle this action.  If the action is to proceed, it should do so in the Central District

wherein the court will best be able to monitor plaintiff's requested injunctive relief.   Adobe's

demands for treble damages and profits will turn largely upon intent and willfulness.

Defendant's testimony will therefore be critical on this issue.  The interest of justice and convenience of the parties will best be served by transfer of this action.  Such an order is respectfully requested.

 Dated:  July 2, 2008

By: _____
      Cheryl L. Hodgson
      HODGSON LAW GROUP
      9606 Santa Monica Blvd., Third Floor
      Beverly Hills, CA 90210
      Attorney for Defendant

## DECLARATION OF EDUARD SARKISOV

I, Eduard Sarkisov, hereby declare as follows:

1.    I am the defendant in this action.  The matters set forth herein are of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2.    This declaration is submitted in support of my Motion to Transfer this Action to the Central District of California.

3.    I reside at 13968 Oxnard Street, Van Nuys, CA  91401 and have lived in the Los Angeles area for nearly 12 years since moving to the United States from Russia at age fourteen.

4.    Since 2000, I have been a student at Cal State Northridge, majoring in Business Administration.  I will graduate in December 2008.  Attached as "Exhibit 1" is a true and correct copy of my student identification card.

5.    As a way of earning money for my college education, and paying off my college education debts, I began looking for products to sell on the Internet via eBay.  I have acted as a reseller of various products on  eBay including ink cartridges, as well as Microsoft products for which I have received verification of authenticity.   Microsoft contacted me and requested that I submit a copy of the product for verification.   Attached as Exhibit 2 is a true and correct copy of the letter I received from Microsoft in January 2008 verifying the product was legitimate, prior to the filing of this action in February by the SIIA.

6.    Sometime in the fall 2007 I had ordered samples of Adobe Photoshop. The samples I received installed as if they were legitimate authorized copies.  The prices I paid were on average $150 per copy.   In part because of the price paid, I believed them to be

1

authentic. Before and after the filing of this action, I was able to locate other sites offering "authentic" Adobe Photoshop software whose pricing was competitive.  The availability of authentic Adobe product at similar pricing reinforce my good faith belief the product I purchased was lawful.

7.     My eBay rating was always extremely high, with a 98% positive feed back rating.  Prior to this lawsuit, I received no notice from Adobe claiming their product was not legal or requesting my cooperation in verifying the product's authenticity.

8.     Adobe filed this action in February 2008, claiming that the copies of Adobe I had purchased were "pirated."  I voluntarily provided details of all purchases to counsel for Adobe.

9.     My attorney and I have received no documentation or proof, despite repeated requests, that the software copies I purchased were in fact "pirated," despite repeated requests, and our complete cooperation.

10,     Adobe has made, or caused to be made repeated public press releases in which I have been named as a "pirate" of Adobe software.  Attached as "Exhibit 3" is a copy of the press release issued on February 13, 2008 at the time the Software & Information Industry Association ("SIIA")

11.     In May 2008, I was singled out in an article appearing on the Internet at www.law.com., a true and correct copy of which is attached as "Exhibit 4."   At no time have I ever participated in the fabrication or manufacture of illegal software.  At all times, I believed the packaged copies which I had purchased were lawful copies.  I believe these press releases have and will cause permanent injury to my reputation, and will impact my ability to secure gainful employment.

12.     I have limited financial resources, and defending the charges made in this

complaint is causing serious financial hardship.  The following is my taxable income for each of the last three years:

2005          $ 12,767

2006          $  2,548

2007          $  9,728

13.    Attached as "Exhibit 5," is a press release dated December 17, 2007 in which Adobe announced record revenues and profits.  "In its fiscal year 2007, Adobe achieved record revenue of $3.158 billion," an increase of 23% over the previous year.

14.    Attached as "Exhibit 6" is a June 17, 2008 press report of Adobe earnings showing its profit rose by 41% for the quarter ending May 30, 2008.  Adobe reported net income of $ 214.9 million for the Second Quarter of 2008.

15.    Thus far, Adobe has refused all offers of settlement unless I pay large amounts of money which I simply do not have.  In view of the inability to settle this case without trial, I am respectfully requesting the case be heard in Los Angeles, where I live and where my records are located.

16.    Since the filing of this case, I have suffered stress related heart problems such as abnormal rate of tricuspid valve regurgitation which has caused discomfort, pain, and sleep deficiency. I have undergone  an echocardiogram and now I am under the care of a cardiologist as well as my regular physician.  Attached as "Exhibit 7" is a true and correct copy of the Echocardiogram Report provided to me on April 24, 2008 after which I was referred to Dr. Reznik, a cardiologist based in Los Angeles, CA.

///

///

DECLARATION OF EDUARD SARKISOV IN SUPPORT OF MOTION TO TRANSFER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 2nd day of July 2008 at Van Nuys, CA.

_____
Eduard Sarkisov

DECLARATION OF EDUARD SARKISOV IN SUPPORT OF MOTION TO TRANSFER

**PROOF OF SERVICE**

**STATE OF CALIFORNIA**          )
                                 )
**COUNTY OF LOS ANGELES**   )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 9606 Santa Monica Boulevard, Third Floor, Beverly Hills, California 90210.

On July 1, 2008, I served the foregoing documents described as **DECLARATION OF EDUARD SARKISOV** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope as follows:

J. Andrew Coombs
Attorney at Law
517 East Wilson Avenue, Suite 202
Glendale, CA 91206

[ X ] **(BY UNITED STATES MAIL)** I deposited such envelope in the mail at Beverly Hills, California.  The envelope was mailed with postage fully prepaid.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

[ ] **(BY TELEFAX)** I caused such document to be transmitted via telefax to the offices of the addressee(s), telefax number:

[ ] **(BY PERSONAL SERVICE/MESSENGER)** I delivered such envelope by hand via messenger service to the office of the addressee.

[ ] **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X] **(Federal)** I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on July 1, 2008 at Beverly Hills, California

_____
CHERYL L. HODGSON

1

1       I declare under penalty of perjury under the laws of the United States that the

2   foregoing is true and correct.

3       Executed on the 2nd day of July 2008 at Van Nuys, CA.

4

5

6

7                                                   Eduard Sarkisov

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF EDUARD SARKISOV IN SUPPORT OF MOTION TO TRANSFER

Page 2 of 9
## Adobe Reports Record Quarterly and Fiscal Year Revenue

### Fourth Quarter GAAP Results

Adobe's GAAP diluted earnings per share for the fourth quarter of fiscal 2007 were $0.38, based on 587.9 million weighted average shares. This compares with GAAP diluted earnings per share of $0.30 reported in the fourth quarter of fiscal 2006 based on 602.2 million weighted average shares, and GAAP diluted earnings per share of $0.34 reported in the third quarter of fiscal 2007 based on 597.3 million weighted average shares. Adobe's fourth quarter GAAP earnings per share target range was $0.35 to $0.37.

GAAP operating income was $275.8 million in the fourth quarter of fiscal 2007, compared to $163.4 million in the fourth quarter of fiscal 2006 and $255.0 million in the third quarter of fiscal 2007. As a percent of revenue, GAAP operating income in the fourth quarter of fiscal 2007 was 30.3 percent, compared to 23.9 percent in the fourth quarter of fiscal 2006 and 29.9 percent in the third quarter of fiscal 2007.

GAAP net income was $222.2 million for the fourth quarter of fiscal 2007, compared to $183.2 million reported in the fourth quarter of fiscal 2006, and $205.2 million in the third quarter of fiscal 2007.

### Fourth Quarter Non-GAAP Results

Non-GAAP diluted earnings per share for the fourth quarter of fiscal 2007 were $0.49. This compares with non-GAAP diluted earnings per share of $0.33 reported in the fourth quarter of fiscal 2006, and non-GAAP diluted earnings per share of $0.45 reported in the third quarter of fiscal 2007. Adobe's fourth quarter non-GAAP earnings per share target range was $0.46 to $0.48.

Adobe's non-GAAP operating income was $362.2 million in the fourth quarter of fiscal 2007, compared to $256.4 million in the fourth quarter of fiscal 2006 and $340.9 million in the third quarter of fiscal 2007. As a percent of revenue, non-GAAP operating income in the fourth quarter of fiscal 2007 was 39.7 percent, compared to 37.6 percent in the fourth quarter of fiscal 2006 and 40.0 percent in the third quarter of fiscal 2007.

Non-GAAP net income was $289.6 million for the fourth quarter of fiscal 2007, compared to $198.9 million in the fourth quarter of fiscal 2006, and $269.4 million in the third quarter of fiscal 2007.

A reconciliation between GAAP and non-GAAP results is provided at the end of this press release.

### Adobe Provides First Quarter and Fiscal Year 2008 Financial Targets

For the first quarter of fiscal 2008, Adobe announced it is targeting revenue of $855 million to $885 million. The Company is targeting a GAAP operating margin of 30 to 31 percent in the first quarter. On a non-GAAP basis, the Company is targeting a first quarter operating margin of approximately 40 percent.

In addition, Adobe is targeting its share count to be between 586 million and 588 million shares in the first quarter of fiscal 2008. The Company also is targeting other income in its first quarter to be $15 million to $17 million, with a GAAP and non-GAAP tax rate of approximately 27 percent.

These targets lead to a first quarter GAAP earnings per share target range of $0.34 to $0.36. On a non-GAAP basis, the Company is targeting earnings per share of $0.44 to $0.46.

2



Investor Relations Contact
Mike Saviage
Adobe Systems Incorporated
408-536-4416
ir@adobe.com

Public Relations Contact
Holly Campbell
Adobe Systems Incorporated
408-536-6401
campbell@adobe.com

**FOR IMMEDIATE RELEASE**

# Adobe Reports Record Quarterly and Fiscal Year Revenue

**Strong Adoption of Creative Suite, Acrobat and Enterprise Solutions Drives 23 Percent Annual Revenue Growth**

SAN JOSE, Calif. — Dec. 17, 2007 — Adobe Systems Incorporated (Nasdaq:ADBE) today reported financial results for its fourth quarter and fiscal year ended Nov. 30, 2007.

In the fourth quarter of fiscal 2007, Adobe achieved record revenue of $911.2 million, compared to $682.2 million reported for the fourth quarter of fiscal 2006 and $851.7 million reported in the third quarter of fiscal 2007. This represents 34 percent year-over-year revenue growth. Adobe's fourth quarter revenue target range was $860 to $890 million.

"Driving our Q4 results were continued adoption of our Creative Suite 3 family of products, record revenue for Acrobat and strong momentum in our enterprise business," said Shantanu Narayen, president and chief executive officer of Adobe. "As we enter fiscal 2008, we are performing exceptionally well and the Company is positioned to achieve a sixth consecutive year of double-digit growth."

**Adobe Reports Record Annual Revenue in Fiscal Year 2007**

In fiscal year 2007, Adobe achieved record revenue of $3.158 billion, compared to $2.575 billion in fiscal 2006. On a year-over-year basis, annual revenue grew 23 percent.

Adobe's annual GAAP net income was $723.8 million in fiscal 2007, compared to $505.8 million in fiscal 2006. Adobe's annual non-GAAP net income was $965.8 million in fiscal 2007, compared to $757.3 million in fiscal 2006.

GAAP diluted earnings per share for fiscal 2007 were $1.21, compared to $0.83 in fiscal 2006. Non-GAAP diluted earnings per share for fiscal 2007 were $1.61, compared to $1.24 in fiscal 2006.

Bain said that the main targets are the sellers at this point. They haven't targeted the auction sites in the lawsuits, but that doesn't mean they don't want them to change.

"We have not sued eBay, but we have been trying to work with them to come up with ways to stem this problem," Bain said.

Software companies also haven't targeted users the way the entertainment industry has, such as suing college students for downloading music from the Internet.

"It's not what we're focused on right now -- it's not to say we won't be," Bain said. "Right now, we view Web sites and auctions as a bigger threat."

Nadel said he will be in charge of coordinating Adobe's anti-piracy efforts, whether that means civil suits, education or working with federal law enforcement.

Stephen Freccero, a Morrison & Foerster partner in San Francisco and former federal prosecutor, said his old colleague will be a good fit for the job.

"There's a lot of people who know the legal framework," Freccero said. "What Ross brings to the table is lots of practical experience in how you investigate and prevent those types of problems."

Michael Rhodes, head of litigation for Cooley, said that the firm will still be working with Nadel.

"Adobe is a good client of the firm and we look forward to working with Ross in his new role," he said.



Contact us for more information

Innovative Litigation Solutions

**Law.com's In-House Counsel**

Select **'Print'** in your browser menu to print this document.

©2008 *In-House Counsel* Online

Page printed from: http://www.inhousecounsel.com

Back to Article

### Ex-Prosecutor to Hunt Software Pirates for Adobe

Zusha Elinson
The Recorder
May 09, 2008



Software pirates beware.

Ross Nadel, the former criminal chief of the San Francisco U.S. Attorney's Office, has joined Adobe Systems Inc. as senior legal counsel of worldwide anti-piracy.

Nadel -- who founded and led the highly-regarded Computer Hacking and Intellectual Property unit -- retired from the office and joined Cooley Godward Kronish two years ago. He said he liked Cooley, but the gig at Adobe, with its distinct flavor of enforcement and cybercrime, was too appealing.

"This position was one that I found very exciting, given my background and experience," Nadel said Wednesday.

Most of the big software companies have at least some in-house lawyers working to track down and stop software pirates; Adobe has had lawyers in similar positions to Nadel's in the past. Symantec Corp.'s so-called "brand protection team" also includes in-house lawyers.

Scott Bain, litigation counsel for the Software & Information Industry Association, said that companies are only throwing more in-house lawyers on the problem as time goes on.

"More and more are devoting legal personnel to this issue," Bain said. "Piracy is such a problem now, it's a full-time job."

Although Nadel wouldn't go into specifics about Adobe's plans to crack down on piracy, Bain said SIIA, of which Adobe is a member, has been focusing recently on pirated software sold on online auction sites like eBay.

So far this year, SIIA has sued around 20 individuals who were auctioning off illegal software, Bain said, adding that the association plans to file suit against more next week.

Several of those suits have been on behalf of Adobe against people like Edward Sarkisov of Van Nuys, Calif., who allegedly sold unauthorized copies of Adobe software like Acrobat and Photoshop under the seller name "drawg99." Sarkisov's lawyer did not return calls seeking comment.

**Case No. C 08-0936**
**Def. Dec. Ex. 4**

often find they've spent good money on bad software.  In addition to taking legal action against software pirates, SIIA is giving consumers tools to help them fight back."

The SIIA Auction Litigation Program is part of a continuing program to work with buyers and sellers on auction sites to get the word out that pirated software is bad for both ends of the sale.  Sellers can be prosecuted and buyers can be stuck with viruses, no technical support and no recourse.  SIIA's Don't Get Mad, Get Even Campaign offers a way for purchasers to strike back – they report the illegal sale, provide proof (disks) and receive money back to buy legal copies. (See www.siia.net/piracy/dgmge.asp for details.)

Additional new programs for auction-site buyers include software buying guides and a certification program for software sellers (Certified Software Resellers) to help steer consumers of auctioned software to sellers who have promised to sell only legal software. These programs represent SIIA's full-frontal assault on auction piracy.

**About SIIA**
The Software & Information Industry Association (SIIA) is the principal trade association for the software and digital content industry. SIIA provides global services in government relations, business development, corporate education and intellectual property protection to more than 800 leading software and information companies. For further information, visit http://www.siia.net.



Software & Information
Industry Association
www.siia.net

# News Release

**For Immediate Release**
SIIA Contact:          Keith Kupferschmid, SVP, Intellectual Property, 202.789.4442
                       Scott Bain, Litigation Counsel, 202.789.4492

## In Most Aggressive Legal Action to Date, SIIA Sues Nine Accused of Selling Pirated Software on eBay

*Suits in Northern California Aimed at Protecting Legitimate Sellers and Unsuspecting Buyers on eBay*

Washington, D.C. – February 13, 2008 – The Software & Information Industry Association (SIIA) announced today it has filed the largest round of lawsuits since launching its auction site anti-piracy program two years ago.  SIIA filed nine separate suits in the US District Court for the Northern District of California, on behalf of members Adobe Systems Incorporated and Symantec Corporation.  The lawsuits are part of SIIA's comprehensive program to battle rampant auctioning of pirated software.

Seven suits were filed today: SIIA, on behalf of Adobe, charged Edward Sarkisov of Van Nuys, CA; John Baptiste of Hurst, TX; Brandon Roberts of Canyon Lake, TX; Don Farr of Redmond , WA; Beverly Johnson & John Baker of Chicago, IL; Brandon Perkins of Corpus Christ, TX and John Baker of Palatine, IL with knowingly selling illegal copies of Adobe® PhotoShop® CS3and other software products on eBay.

These suits are in addition to two suits filed against eBay sellers two weeks ago. The first of these charges that Corey C. Ressler of Hamilton, New Jersey knowingly sold pirated copies of Adobe Photoshop CS3 software.  The second charges Joshua McClymonds and associates with selling Symantec pcAnywhere 11.0 Host and Remote, pcAnywhere 10.5 Host and Remote and Norton Utilities 8.0 for Macintosh with the same type of piracy.

"SIIA has declared war against those who continue to sell pirated software on auction sites such as eBay," says Keith Kupferschmid, SVP of SIIA's Anti-Piracy Division.  "Our goal is to give illegal software sellers a rude awakening, so that unsuspecting software buyers and legitimate sellers are protected.  For too long, auction sellers have been able to sell pirated software while risking only the removal of their auction.  SIIA has upped the ante by bringing those who pirate software to justice in court."

The nine suits represent the most significant legal action SIIA has taken since launching its Auction Litigation Program, which monitors popular online auction sites, identifies individuals or groups selling pirated software and sues those pirates on behalf of the association's member companies. The program has led to successful prosecutions of eBay pirates and OEM software sellers, such as the defendants in the <u>Symantec, et al. v. Chan et al.</u> case several months ago, who were reselling OEM, unbundled, counterfeit and other copies of software not authorized for resale.

"Online auctioning of pirated software hurts both business and consumers," said Scott Bain, litigation counsel.  "When consumers buy cheap, illegal software, they get no support and

January 8, 2008

Edward Sarkisov
13968 Oxnard St
Van Nuys, CA 91401

**Re: Microsoft Office Small Business Management Edition 2006**

Dear Mr. Sarkisov,

We would like to take this opportunity to thank you for your cooperation with our efforts to monitor the distribution of Microsoft software on eBay. Through these efforts, we are striving to make the Internet a safer place for merchants and customers to conduct their business.

Our product identification specialists have analyzed the enclosed package of Office Small Business Management Edition 2006 software ("SOFTWARE SAMPLE") submitted on 01/07/2008 and have determined it to be **genuine**. Based on our evaluation, this particular SOFTWARE SAMPLE is authorized for distribution.

This letter only certifies the authenticity of this individual SOFTWARE SAMPLE evaluated on 01/07/2008 and makes no representations regarding any other software packages. This letter may not be replicated and/or used to purport the authenticity of additional software packages, including those obtained from the same vendor. Please attach a copy of your invoice to this letter and retain it with your software records to show that Microsoft has confirmed the authenticity of this SOFTWARE SAMPLE. Please keep this letter in a safe place as Microsoft will not replace it.

It is important to remember that there is a large quantity of counterfeit and unauthorized software circulating in secondary markets. The acquisition of one genuine software package from a particular vendor does not guarantee that subsequent software orders from the same vendor will yield genuine software.

At Microsoft, we devote substantial time and energy to protecting our customers from acquiring illegal software. As part of the anti-piracy program, Microsoft, in association with the Business Software Alliance (BSA), has developed a series of educational materials to assist end users. Additional anti-piracy information is available on the Internet's Worldwide Web by visiting Microsoft at http://www.microsoft.com/piracy or the BSA at http://www.bsa.org.

Your assistance with our auction monitoring program is greatly appreciated. Your cooperation with our efforts to protect customers from receiving unlicensed or unauthorized software is a valuable contribution to the success of our work. Thank you for your help.

Sincerely,

Microsoft Internet Auction Monitoring Team

Enclosure

Microsoft Corporation is an equal opportunity employer.



## Adobe Reports Record Quarterly and Fiscal Year Revenue

For fiscal year 2008, Adobe reaffirmed it is targeting annual revenue growth of approximately 13 percent. The Company is targeting a GAAP operating margin of approximately 30 percent, and a non-GAAP operating margin of approximately 39 percent.

A reconciliation between GAAP and non-GAAP financial targets is provided at the end of this press release.

### Forward-Looking Statements Disclosure

This press release contains forward-looking statements, including those related to revenue, operating margin, other income, tax rate, share count, earnings per share, and anticipated business momentum which involve risks and uncertainties that could cause actual results to differ materially. Factors that might cause or contribute to such differences include, but are not limited to: delays in development or shipment of Adobe's new products or major new versions of existing products, introduction of new products by existing and new competitors, failure to successfully manage transitions to new business models and markets, adverse changes in general economic or political conditions in any of the major countries in which Adobe does business, difficulty in predicting revenue from new businesses, failure to anticipate and develop new products and services in response to changes in demand for application software and software delivery, computers, printers, or other non PC-devices, costs related to intellectual property acquisitions, disputes and litigation, inability to protect Adobe's intellectual property from unauthorized copying, use, disclosure or malicious attack, failure to realize the anticipated benefits of past or future acquisitions and difficulty in integrating such acquisitions, changes to Adobe's distribution channel, disruption of Adobe's business due to catastrophic events, risks associated with international operations, fluctuations in foreign currency exchange rates, changes in, or interpretations of, accounting principles, impairment of Adobe's goodwill or intangible assets, unanticipated changes in, or interpretations of, Adobe's effective tax rates, Adobe's inability to attract and retain key personnel, market risks associated with Adobe's equity investments, and interruptions or terminations in Adobe's relationships with turnkey assemblers. For further discussion of these and other risks and uncertainties, individuals should refer to Adobe's SEC filings.

The financial information set forth in this press release reflects estimates based on information available at this time. These amounts could differ from actual reported amounts stated in Adobe's Annual Report on Form 10-K for the fiscal year ended Nov. 30, 2007, which the Company expects to file in January 2008. Adobe does not undertake an obligation to update forward-looking statements.

### About Adobe Systems Incorporated

Adobe revolutionizes how the world engages with ideas and information – anytime, anywhere and through any medium. For more information, visit www.adobe.com.

### ###

© 2007 Adobe Systems Incorporated. All rights reserved. Adobe, the Adobe logo, Creative Suite and Acrobat are either registered trademarks or trademarks of Adobe Systems Incorporated in the United States and/or other countries. All other trademarks are the property of their respective owners.

Page 4 of 9
**Adobe Reports Record Quarterly and Fiscal Year Revenue**

Condensed Consolidated Statements of Income
(In thousands, except per share data; unaudited)

| | Three Months Ended | | Year Ended | |
|---|---|---|---|---|
| | November 30, 2007 | December 1, 2006 | November 30, 2007 | December 1, 2006 |
| Revenue: | | | | |
| Products | $ 872,375 | $ 653,805 | $ 3,019,524 | $ 2,484,710 |
| Services and support | 38,836 | 28,370 | 138,357 | 90,590 |
| Total revenue | 911,211 | 682,175 | 3,157,881 | 2,575,300 |
| Total cost of revenue: | | | | |
| Products | 77,286 | 61,080 | 270,818 | 226,506 |
| Services and support | 21,310 | 18,545 | 83,876 | 65,951 |
| Total cost of revenue | 98,596 | 79,625 | 354,694 | 292,457 |
| Gross profit | 812,615 | 602,550 | 2,803,187 | 2,282,843 |
| Operating expenses: | | | | |
| Research and development | 162,847 | 138,416 | 613,242 | 539,684 |
| Sales and marketing | 282,065 | 225,727 | 984,388 | 867,145 |
| General and administrative | 73,978 | 57,273 | 274,982 | 234,597 |
| Restructuring and other charges | — | — | 555 | 20,251 |
| Amortization of purchased intangibles and incomplete technology | 17,893 | 17,762 | 72,435 | 69,873 |
| Total operating expenses | 536,783 | 439,178 | 1,945,602 | 1,731,550 |
| Operating income | 275,832 | 163,372 | 857,585 | 551,293 |
| Non-operating income: | | | | |
| Investment gain (loss) | (1,935) | 64,967 | 7,134 | 61,249 |
| Interest and other income, net | 16,780 | 19,622 | 82,471 | 67,185 |
| Total non-operating income | 14,845 | 84,589 | 89,605 | 128,434 |
| Income before income taxes | 290,677 | 247,961 | 947,190 | 679,727 |
| Provision for income taxes | 68,469 | 64,717 | 223,383 | 173,918 |
| Net income | $ 222,208 | $ 183,244 | $ 723,807 | $ 505,809 |
| Basic net income per share | $ 0.39 | $ 0.31 | $ 1.24 | $ 0.85 |
| Shares used in computing basic net income per share | 574,716 | 584,798 | 584,203 | 593,750 |
| Diluted net income per share | $ 0.38 | $ 0.30 | $ 1.21 | $ 0.83 |
| Shares used in computing diluted net income per share | 587,865 | 602,175 | 598,775 | 612,222 |

Page 5 of 9
**Adobe Reports Record Quarterly and Fiscal Year Revenue**

Condensed Consolidated Balance Sheets

(In thousands, except per share data; unaudited)

| | November 30, 2007 | December 1, 2006 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 946,422 | $ 772,500 |
| Short-term investments | 1,047,432 | 1,508,379 |
| Trade receivables, net of allowances for doubtful accounts of $4,398 and $6,798, respectively | 318,145 | 356,815 |
| Other receivables | 44,666 | 51,851 |
| Deferred income taxes | 171,472 | 155,613 |
| Prepaid expenses and other assets | 44,840 | 39,311 |
| Total current assets | 2,572,977 | 2,884,469 |
| Property and equipment, net | 289,758 | 227,197 |
| Goodwill | 2,148,102 | 2,149,494 |
| Purchased and other intangibles, net | 402,619 | 506,405 |
| Investment in lease receivable | 207,239 | 126,800 |
| Other assets | 92,984 | 68,183 |
| | $ 5,713,679 | $ 5,962,548 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Trade and other payables | $ 66,867 | $ 55,031 |
| Accrued expenses | 383,436 | 303,550 |
| Accrued restructuring | 3,731 | 10,088 |
| Income taxes payable | 215,058 | 178,368 |
| Deferred revenue | 183,318 | 130,310 |
| Total current liabilities | 852,410 | 677,347 |
| Long-term liabilities: | | |
| Deferred revenue | 25,950 | 32,644 |
| Deferred income taxes | 148,943 | 70,715 |
| Accrued restructuring | 13,987 | 21,984 |
| Other liabilities | 22,407 | 7,982 |
| Total liabilities | 1,063,697 | 810,672 |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; 2,000 shares authorized | — | — |
| Common stock, $0.0001 par value | 61 | 61 |
| Additional paid-in-capital | 2,340,969 | 2,451,610 |
| Retained earnings | 4,041,592 | 3,317,785 |
| Accumulated other comprehensive income | 27,948 | 6,344 |
| Treasury stock, at cost (29,425 and 13,608 shares, respectively), net of re-issuances | (1,760,588) | (623,924) |
| Total stockholders' equity | 4,649,982 | 5,151,876 |
| | $ 5,713,679 | $ 5,962,548 |

**Adobe Reports Record Quarterly and Fiscal Year Revenue**

Condensed Consolidated Statements of Cash Flows
(In thousands; unaudited)

|  | Three Months Ended | |
|---|---|---|
|  | November 30, 2007 | December 1, 2006 |
| Cash flows from operating activities: |  |  |
| Net income | $ 222,208 | $ 183,244 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Depreciation, amortization, and accretion | 78,190 | 75,276 |
| (Tax related benefits), net of stock compensation expense | (11,750) | 69,340 |
| Net investment (gains) losses | 4,058 | (75,648) |
| Changes in deferred revenue | 17,166 | 38,163 |
| Changes in operating assets and liabilities | 88,155 | 661 |
| Net cash provided by operating activities | 398,027 | 291,036 |
| Cash flows from investing activities: |  |  |
| Sales and maturities of short-term investments, net of (purchases) | 358,572 | (155,814) |
| Purchases of property and equipment | (28,131) | (33,081) |
| Purchases of long term investments and other assets, net of sales | (25,002) | 62,921 |
| Acquisitions, net of cash | (8,798) | (17,499) |
| Net cash provided by (used for) investing activities | 296,641 | (143,473) |
| Cash flows from financing activities: |  |  |
| Purchases of treasury stock, net of re-issuances | (338,378) | (51,957) |
| Excess tax benefits from stock-based compensation | 30,654 | 31,702 |
| Net cash used for financing activities | (307,724) | (20,255) |
| Effect of exchange rate changes on cash and cash equivalents | 195 | 438 |
| Net increase in cash and cash equivalents | 387,139 | 127,746 |
| Cash and cash equivalents at beginning of period | 559,283 | 644,754 |
| Cash and cash equivalents at end of period | $ 946,422 | $ 772,500 |

Page 7 of 9
**Adobe Reports Record Quarterly and Fiscal Year Revenue**

Non-GAAP Results
(In thousands, except per share data)

The following table shows Adobe's non-GAAP results reconciled to GAAP results included in this release.

| | Three Months Ended | | | Year Ended | |
| --- | --- | --- | --- | --- | --- |
| | November 30, 2007 | December 1, 2006 | August 31, 2007 | November 30, 2007 | December 1, 2006 |
| GAAP operating income | $ 275,832 | $ 163,372 | $ 255,025 | $ 857,585 | $ 551,293 |
| SFAS 123R stock-based compensation | 35,078 | 30,006 | 32,805 | 125,964 | 106,845 |
| Amortization of Macromedia stock-based compensation | 4,713 | 9,505 | 5,902 | 24,023 | 63,686 |
| Restructuring and other charges | — | — | 555 | 555 | 20,251 |
| Amortization of purchased intangibles and incomplete technology | 46,570 | 53,484 | 46,570 | 200,810 | 217,007 |
| Non-GAAP operating income | $ 362,193 | $ 256,367 | $ 340,857 | $ 1,208,937 | $ 959,082 |
| | | | | | |
| GAAP net income | $ 222,208 | $ 183,244 | $ 205,243 | $ 723,807 | $ 505,809 |
| SFAS 123R stock-based compensation, net of tax | 26,800 | 17,133 | 24,307 | 92,537 | 74,925 |
| Amortization of Macromedia stock-based compensation, net of tax | 3,601 | 5,427 | 4,373 | 17,720 | 45,308 |
| Restructuring and other charges, net of tax | — | — | 411 | 411 | 14,900 |
| Amortization of purchased intangibles and incomplete technology, net of tax | 35,524 | 30,539 | 34,521 | 147,986 | 150,915 |
| R&D tax benefit, net of tax | — | — | — | (12,330) | — |
| Investment (gain) loss, net of tax | 1,478 | (37,450) | 514 | (4,312) | (34,596) |
| Non-GAAP net income | $ 289,611 | $ 198,893 | $ 269,369 | $ 965,819 | $ 757,261 |
| | | | | | |
| Diluted net income per share: | | | | | |
| | | | | | |
| GAAP net income | $ 0.38 | $ 0.30 | $ 0.34 | $ 1.21 | $ 0.83 |
| SFAS 123R stock-based compensation, net of tax | 0.05 | 0.03 | 0.04 | 0.15 | 0.12 |
| Amortization of Macromedia stock-based compensation, net of tax | 0.01 | 0.01 | 0.01 | 0.03 | 0.07 |
| Restructuring and other charges, net of tax | — | — | — | — | 0.02 |
| Amortization of purchased intangibles and incomplete technology, net of tax | 0.05 | 0.05 | 0.06 | 0.25 | 0.26 |
| R&D tax benefit, net of tax | — | — | — | (0.02) | — |
| Investment (gain) loss, net of tax | — | (0.06) | — | (0.01) | (0.06) |
| Non-GAAP net income | $ 0.49 | $ 0.33 | $ 0.45 | $ 1.61 | $ 1.24 |
| | | | | | |
| Shares used computing diluted net income per share | 587,865 | 602,175 | 597,334 | 598,775 | 612,222 |

Page 8 of 9
**Adobe Reports Record Quarterly and Fiscal Year Revenue**

The following table shows the Company's reconciliation of non-GAAP to GAAP operating expense.

|  | | Three Months Ended | |
|---|---|---|---|
|  | | November 30, 2007 | August 31, 2007 |
| GAAP operating expenses | $ | 536,783 $ | 504,040 |
| SFAS 123R stock-based compensation | | (34,414) | (31,952) |
| Amortization of Macromedia stock-based compensation | | (4,163) | (5,214) |
| Restructuring and other charges | | — | (555) |
| Amortization of purchased intangibles and incomplete technology | | (17,893) | (17,893) |
| Non-GAAP operating expenses | $ | 480,313 $ | 448,426 |

The following table shows the Company's reconciliation of non-GAAP to GAAP operating margin.

|  | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
|  | November 30 2007 | December 1, 2006 | August 31, 2007 | November 30, 2007 | December 1, 2006 |
| GAAP operating margin | 30.3% | 24.0% | 29.9% | 27.2% | 21.4% |
| SFAS 123R stock-based compensation | 3.8 | 4.4 | 3.9 | 4.0 | 4.1 |
| Amortization of Macromedia stock-based compensation | 0.5 | 1.4 | 0.7 | 0.8 | 2.5 |
| Restructuring and other charges | — | — | 0.1 | — | 0.8 |
| Amortization of purchased intangibles and incomplete technology | 5.1 | 7.8 | 5.4 | 6.3 | 8.4 |
| Non-GAAP operating margin | 39.7% | 37.6% | 40.0% | 38.3% | 37.2% |

Page 9 of 9

## Adobe Reports Record Quarterly and Fiscal Year Revenue

First Quarter and Fiscal Year 2008 Non-GAAP Financial Targets

The following tables show Adobe's First Quarter and Fiscal Year 2008 non-GAAP financial targets reconciled to GAAP financial targets included in this release.

|  | First Quarter Fiscal 2008 | | Fiscal Year |
|  | Low | High | 2008 |
| --- | --- | --- | --- |
| GAAP operating margin | 30.0% | 31.0% | 30.0% |
| SFAS 123R stock-based compensation | 5.3 | 4.6 | 4.8 |
| Amortization of purchased intangibles and incomplete technology | 4.7 | 4.4 | 4.2 |
| Non-GAAP operating margin | 40.0% | 40.0% | 39.0% |

|  | First Quarter Fiscal 2008 | | | |
|  | Low | | High | |
| --- | --- | --- | --- | --- |
| GAAP net income per share | $ | 0.34 | $ | 0.36 |
| SFAS 123R stock-based compensation, net of tax | | 0.06 | | 0.05 |
| Amortization of purchased intangibles and incomplete technology, net of tax | | 0.04 | | 0.05 |
| Non-GAAP net income per share | $ | 0.44 | $ | 0.46 |
| Shares used in computing diluted net income per share | | 588.0 | | 586.0 |

Adobe continues to provide all information required in accordance with GAAP, but believes evaluating its ongoing operating results may not be as useful if an investor is limited to reviewing only GAAP financial measures. Accordingly, Adobe uses non-GAAP financial information to evaluate its ongoing operations and for internal planning and forecasting purposes. Adobe's management does not itself, nor does it suggest that investors should, consider such non-GAAP financial measures in isolation from, or as a substitute for, financial information prepared in accordance with GAAP. Adobe presents such non-GAAP financial measures in reporting its financial results to provide investors with an additional tool to evaluate Adobe's operating results in a manner that focuses on what Adobe believes to be its ongoing business operations. Adobe's management believes it is useful for itself and investors to review, as applicable, both GAAP information that includes the stock-based compensation impact of SFAS 123R and related tax impact, amortization of Macromedia stock-based compensation and related tax impact, restructuring and other charges and related tax impact, amortization of purchased intangibles and incomplete technology and related tax impact, investment gains and losses and related tax impact, the net tax impact of the R&D tax benefit, the income tax effect of the non-GAAP pre-tax adjustments from the provision for income taxes, and the non-GAAP measures that exclude such information in order to assess the performance of Adobe's business and for planning and forecasting in subsequent periods. Whenever Adobe uses such a non-GAAP financial measure, it provides a reconciliation of the non-GAAP financial measure to the most closely applicable GAAP financial measure. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these non-GAAP financial measures to their most directly comparable GAAP financial measure as detailed above.

Case 3:08-cv-00936-PJH    Document 16-4    Filed 07/02/2008    Page 7 of 10

 **Associated Press**

**Related News**

Tech Winners & Losers:
Amazon.com
TheStreet.com - Jun 17, 2008

Adobe's Net Rises 41% On
Overseas Sales
Wall Street Journal - Jun 17, 2008

Ahead of the Bell: Adobe
Systems
Forbes - Jun 17, 2008

Full coverage »



# Adobe second-quarter earnings jump 41 percent

By AMANDA FEHD – Jun 17, 2008

SAN FRANCISCO (AP) — Adobe Systems Inc.'s profit rose 41 percent in the second quarter because of strong sales and booming demand in international markets.

For the three months ended May 30, the maker of Photoshop design software and the Acrobat publishing tool reported Monday that it earned $214.9 million, or 40 cents per share, compared to $152.5 million, or 25 cents per share, in the same quarter a year ago.

Excluding special items, the software maker reported income of $272.7 million, or 50 cents a share, compared to $223.2 million, or 37 cents a share in the same quarter a year ago.

On that same basis, analysts polled by Thomson Financial had predicted, on average, earnings per share of 46 cents on revenue of $880 million.

Actual revenue beat those expectations at $886.9 million, up 19 percent from $745.6 million a year ago.

Sales in foreign markets with stronger currencies than the dollar translated into more dollars for Adobe. About 5 percent of second-quarter revenue, or $44 million, came as a result of positive foreign exchange rates, Chief Financial Officer Mark Garrett told investors in a conference call.

More than half Adobe's sales some from overseas.

Emerging markets in Eastern Europe, Brazil and China offer great opportunities for growth as software piracy declines, Chief Executive Shantanu Narayen said in an interview with The Associated Press.

Narayen said the company's positive performance results from burgeoning demand for digital content and from the fact that both Adobe's geographic reach and its product mix are very diversified.

"The amount of video that's being used on the Web continues to explode, and I think frankly we are very early in people using video on the web," Narayen said. "The desire to continue to consume personalized content is going to continue for a long time."

The San Jose-Calif.-based company expects third-quarter earnings of 34 cents to 36 cents per share, or 45 cents to 47 cents per share on an adjusted basis.

Adobe expects revenue of $855 million to $885 million in the third quarter.

Shares of Adobe closed Monday at $42.85, up one-third of 1 percent, before the results were announced. In after-hours trading, they rose initially and then fell 99 cents, or 2.5 percent, to $41.86.

Global Equities Research analyst Trip Chowdhry said Adobe executed very well in a terrible economic situation. But he doubted the company could sustain such results longer than a couple more quarters, mainly because of high oil prices.

"Every customer of Adobe, direct or indirect, is being crunched because of the oil prices," Chowdhry said. Even if technology companies are getting a pass so far, as some analysts believe, each segment will eventually be hit, he said.

"Software companies will get hit in the second wave. And then the consumer says, 'Guys, I just don't need the next Web site,' or 'Guys, I just don't need the next iPod'; 'Guys, I've had enough,'" Chowdhry said.

Narayen would not elaborate on expectations past the third quarter but disagreed that demand for Adobe products might soon fall.

"We always say we are not recession proof, but Adobe is also not one of those providers of luxury goods," Narayen said. "It's a productivity tool that enables knowledge workers to be more productive, and so maybe our impact is a little more muted than some other companies."

**Case No. C 08-0936
Def. Dec. Ex. 6**

7/1/2008 11:42 AM

Bain said that the main targets are the sellers at this point. They haven't targeted the auction sites in the lawsuits, but that doesn't mean they don't want them to change.

"We have not sued eBay, but we have been trying to work with them to come up with ways to stem this problem," Bain said.

Software companies also haven't targeted users the way the entertainment industry has, such as suing college students for downloading music from the Internet.

"It's not what we're focused on right now -- it's not to say we won't be," Bain said. "Right now, we view Web sites and auctions as a bigger threat."

Nadel said he will be in charge of coordinating Adobe's anti-piracy efforts, whether that means civil suits, education or working with federal law enforcement.

Stephen Freccero, a Morrison & Foerster partner in San Francisco and former federal prosecutor, said his old colleague will be a good fit for the job.

"There's a lot of people who know the legal framework," Freccero said. "What Ross brings to the table is lots of practical experience in how you investigate and prevent those types of problems."

Michael Rhodes, head of litigation for Cooley, said that the firm will still be working with Nadel.

"Adobe is a good client of the firm and we look forward to working with Ross in his new role," he said.

PATIENT NAME:  SARKISOV, EDUARD
AGE         :  25
PHYSICIAN    :  DR. VAYNEROV
DATE OF EXAM:  04/24/08

## ECHOCARDIOGRAM   REPORT
M-Mode and Two Dimensional with Doppler Studies

**TECHNIQUE:**
Gray scale real-time, M-mode and Doppler images were obtained for n
invasive evaluation of the wall motion, chambers, pericardial spa
measurements of blood flow, shunts, pressures, and pressure gradie
Transvalvular flow was evaluated by color Doppler mapping.

PRIMARY CATEGORIES MEASURED:

|  | STANDARD | ACTUAL |  | STANDARD | ACTUAL |
|---|---|---|---|---|---|
| 1.LV-DIASTOLIC | <5.7 | 4.9 | 6.RIGHT VENTRICLE | <2.6 | 1.3 |
| 2.LV-SYSTOLIC | <4.0 | 3.4 | 7.AORTIC VALVE | >1.3 | 1.3 |
| 3.LVPW (Thickness Di) | <1.1 | 1.2 | 8.AORTIC ROOT | <4.0 | 2.7 |
| 4.SEPTAL(Thickness) | <1.1 | 1.2 | 9.EJECTION FRACTION |  | 58 |
| 5.LEFT ATRIUM | <4.0 | 3.7 |  |  |  |

The examination was done using realtime, M-mode recordings and doppler.

There is abnormal mosaic pattern present over the tricuspid valve ar
during the color flow doppler examination.  No generalized cardiomegaly
pericardial effusions or thickening is noted.

The end diastolic diameter of the left ventricle and the end systo
diameter are normal.  The ejection fraction is normal at 58%. 
interventricular septum and left ventricular posterior wall thicknesses 
normal.  The right ventricle, left atrium and aortic root are normal.  Th
is moderate tricuspid valve regurgitation.  The pulmonary artery pressure
at 23.2 mmHg.

**IMPRESSION:**

1.    NORMAL LEFT VENTRICULAR FUNCTION AND WALL MOTION WITH NORMAL L
      VENTRICULAR EJECTION FRACTION AT 58%.
2.    THERE IS NO PERICARDIAL EFFUSION, THROMBUS, OR VEGETATION.
3.    MODERATE TRICUSPID VALVE REGURGITATION.

George Mednik, M.D.,Ph.D.
Diplomat of the American Board of Radiology
GM/lf
D:04/25/08
T:04/28/08

# PROOF OF SERVICE

**STATE OF CALIFORNIA** )
                         )
**COUNTY OF LOS ANGELES** )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 9606 Santa Monica Boulevard, Third Floor, Beverly Hills, California 90210.

On July 2, 2008, I served the foregoing documents described as **MOTION TO TRANSFER ACTION; MEMO OF POINTS AND AUTHORITIES AND DECLARATION OF EDUARD SARKISOV** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope as follows:

J. Andrew Coombs
Attorney at Law
517 East Wilson Avenue, Suite 202
Glendale, CA 91206

[ X ]    **(BY UNITED STATES MAIL)** I deposited such envelope in the mail at Beverly Hills, California. The envelope was mailed with postage fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

[ ]    **(BY TELEFAX)** I caused such document to be transmitted via telefax to the offices of the addressee(s), telefax number:

[ ]    **(BY PERSONAL SERVICE/MESSENGER)** I delivered such envelope by hand via messenger service to the office of the addressee.

[ ]    **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]    **(Federal)** I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on July 2, 2008 at Beverly Hills, California.

CHERYL L. HODGSON

-1-